IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

GUESTHOUSE INTERNATIONAL    )
FRANCHISE SYSTEMS, INC.,    )
    )
    Plaintiff,    )
    )
v.    )    **Case No. 3:07-0814**
    )    **Judge Trauger**
BRITISH AMERICAN PROPERTIES    )
MACARTHUR INN, LLC, THOMAS F.    )
NOONS, and EDWIN W. LESLIE,    )
    )
    Defendants.    )
    )

**MEMORANDUM**

Pending before the court are the defendants' Motion for Judicial Notice (Docket No. 59),

the plaintiff's Motion for Summary Judgment (Docket No. 63), the defendants' Partial Motion

for Summary Judgment (Docket No. 67), and the defendants' two motions to strike (Docket Nos.

81 and 84).[1] For the reasons discussed herein, the plaintiff's and the defendants' motions for

summary judgment will both be granted in part and denied in part, and all other pending motions

---

[1] A few points of clarification are important to make at the outset. First, while, for convenience purposes, this case has remained captioned in briefing and in this court's orders with "Guesthouse International Franchise Systems, Inc" ("Guesthouse") as the named plaintiff, this court has substituted Sumner Ventures, Inc., for Guesthouse, as the proper party in interest. (Docket No. 54.) Sumner Ventures and Guesthouse merged on January 1, 2008, with Sumner Ventures acquiring all shares of Guesthouse. (Docket No. 52 Ex. 1.) For convenience purposes and because all of the relevant events occurred when the plaintiff was known as "Guesthouse," the court will refer to the plaintiff as "Guesthouse." Second, when the court refers here to the filings of the "defendants" it is referring to the filings of defendants British American Properties MacArthur Inn, LLC, and Thomas F. Noons, as Edwin W. Leslie has not participated in the briefing of the motions presently before the court.

1

will be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

This case concerns a failed franchise arrangement involving a hotel in Alexandria, Louisiana.[2] The two individual defendants in this case, Thomas Noons and Edwin Leslie, have extensive experience in hotel and land development. Leslie, for instance, has been in the hospitality industry since 1986, did development work for Hilton Hotels, and worked for more than five years for Westmont Hospitality, overseeing fifty-two hotels. For his part, Noons has more than fifteen years of experience as a full-time real estate investor, and he has been personally involved in the formation and/or operation of at least fifty real estate limited partnerships.

Along with another individual, Noons and Leslie formed British American Properties MacArthur Inn, LLC ("BAP"), the corporate defendant in this case, to acquire and operate a hotel in Alexandria, Louisiana. After acquiring the hotel, in the spring and summer of 2004, Leslie negotiated with various hotel chains with whom BAP might affiliate its hotel. (Docket No. 70 Ex. 5 at 63-65.) One of the chains with whom Leslie negotiated was Guesthouse. The negotiations between Guesthouse and Leslie proceeded toward an agreement in the late summer and fall of 2004.

_____

[2]Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Nos. 64, 69, 72, and 76) and related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

2

Under Federal Trade Commission regulations, a franchiser such as Guesthouse is required to provide prospective franchisees with a document called a Uniform Franchise Offering Circular ("UFOC"), which provides prospective franchisees with valuable information about the franchise, including information on how the franchise arrangement will work, the fees and obligations that will be expected of the franchisee, and the financial status of the franchiser, among many other things. (See Docket No. 70 Ex. 9.) The UFOC, while somewhat standard in form, provides a wealth of particularized, valuable information for the prospective franchisee to use in weighing whether to enter into the franchise agreement. Defendant Leslie was particularly familiar with the UFOC concept from previous franchise engagements. (Docket No. 70 Ex. 5 at 114.)

In this case, there remains substantial dispute about whether the Guesthouse UFOC was ever delivered to BAP. Leslie, who was the managing member for BAP and who was the individual primarily responsible for BAP's operations, signed a receipt document, dated September 12, 2004, acknowledging that he had received Guesthouse's UFOC and all related exhibits. (Docket No. 70 Ex. 7.) Ronald Marcou, who was Guesthouse's primary negotiator with Leslie (and thereby BAP), submitted an affidavit stating that "I have never had a prospective franchisee sign such a receipt without actually providing the UFOC to the prospective franchisee. To the best of my recollection, we provided a copy of Guesthouse's UFOC to Mr. Leslie when we met with him at Guesthouse's offices in Hendersonville, Tennessee." (Docket No. 75 Ex. 1.) Leslie now contends that he never received a UFOC from Guesthouse. (Docket No. 70 Ex. 5 at 134.)

Therefore, while there remains substantial dispute about whether Guesthouse ever

delivered the UFOC to BAP, there is no allegation in this case that anyone from BAP ever read Guesthouse's UFOC prior to BAP's entering into a franchise agreement with Guesthouse. It is undisputed that Noons had no communications with Guesthouse concerning the hotel, and neither side makes any allegation that the other member of BAP, Ms. Hadnot, received or reviewed the UFOC during the relevant time period. That said, one of the defendants' key allegations in briefing is that the Guesthouse UFOC was deceptive and misleading in more than a dozen ways, including that the UFOC failed to disclose key litigation pending against Guesthouse, did not provide an accurate estimate of signage expense, and did not properly disclose "the computer hardware and software requirements relating [to] the operation of the franchise." (Docket No. 69 at 3.)

As indicated above, Leslie was the primary contact between BAP and Guesthouse during the franchise negotiation process. In his deposition, Leslie testified to numerous representations that he recalls Guesthouse representatives making about how Guesthouse would support BAP once the franchise agreement was in place. For instance, Leslie testified that Guesthouse promised that "they would make monthly marketing presentations to the staff, they would train the sales staff ... they visited the property and said [they] would make monthly visits as well as sales calls ...". (Docket No. 70 Ex. 5 at 74.) In sum, Leslie testified that, over the course of several months of negotiations, five or six Guesthouse representatives made a series of not particularly specific representations to the effect that Guesthouse would be on hand for BAP with continuing support once the franchise agreement was in place. (*Id.* at 73-82.) According to Leslie, Guesthouse did not live up to these promises. (*Id.*)

4

On April 6, 2005, Guesthouse and BAP entered into a License Agreement, which gave BAP the right to operate its hotel under the "Guesthouse" name under the terms and conditions outlined in the agreement, which included that BAP would pay Guesthouse monthly reservation and operating fees.  (Docket No. 70 Ex. 8.)  The License Agreement was for a term of seven years from the date the facility (formerly known as the MacArthur Inn) opened as a Guesthouse Inn.

Paragraph 16(e) of the License Agreement is a "liquidated damages" provision that provides that, should BAP, without excuse, fail to operate the inn as a Guesthouse Inn during the period of the License Agreement, Guesthouse may terminate the License Agreement and BAP "shall promptly pay all sums owing to [Guesthouse]," specifically, the total monthly operating fees and reservation fees owed to Guesthouse through the remaining term of the agreement. (Docket No. 70 Ex. 8 at 17.)  The lost operating fees are calculated by simply multiplying the number of guest rooms by a small daily charge (ranging from ninety cents to $1.25 a day depending on the year of the agreement) and adding those charges together.  (*Id.* at 17, A-1.)  The lost reservation fees, on the other hand, are calculated by "multiplying the number of years remaining in the term of this Agreement (rounding any partial years up to the next whole number) by the sum of the monthly Reservation Fees ... due ... during the one year period immediately preceding the notice of termination (annualized to the extent this Agreement was not in effect for the entirety of said one year period.")  (*Id.* at 17-18.)

The License Agreement contained some other key provisions.  First, it stated that the License Agreement was the entire agreement between the parties, and "there are no representations, inducements, promises, agreements, arrangements or undertakings, oral or

5

written, that have been relied upon by the parties other than those set forth herein." (*Id*. at 22.)

Second, the License Agreement, in capital letters, stated that: " [BAP] acknowledges that

[Guesthouse] and its representatives have made no representations to [BAP], other than or

inconsistent with, the matters set forth in the [UFOC] provided to [BAP], and that [BAP] has

undertaken this venture solely in reliance upon the matters set forth in the [UFOC] and [BAP's]

own independent investigation of the merits of this venture." (*Id.*)  As the License Agreement

and the UFOC do not include the representations supposedly made to Leslie, it is not surprising

that the importance of these provisions has been the subject of substantial debate in this litigation.

Also on April 6, 2005, Noons and Leslie signed a Guaranty Agreement, in which they

"guarantee[d] the timely performance by [BAP] of its obligations under the License Agreement ...

including, without limitation, the prompt payment when due of all license fees, franchise fees,

royalties or operating fees, advertising or marketing fees and reservation system fees."  (Docket

No. 1 Ex. 2.)  In November 2005, BAP also executed a Promissory Note in favor of Guesthouse

in the amount of $25,000.  Apparently, some of this money went toward BAP's purchase of the

exterior "Guesthouse" signage for the hotel.  The Promissory Note provides that it is payable as

of the date of the termination of the License Agreement.  (Docket No. 1 Ex. 3.)

The Alexandria property began operations as a Guesthouse Inn on February 1, 2006.  The

problems began almost immediately thereafter.  While the License Agreement called for BAP to

perform renovations on the rooms of the hotel, those renovations quickly fell behind schedule or

were abandoned, partially because BAP had difficulty obtaining financing and had difficulties

6

complying with the fire code.   Additionally, Guesthouse's quality assurance personnel made three site inspections of the hotel, all of which resulted in failing grades, with one report describing the sight of a roach "bigger than my cat."  Needless to say, occupancy numbers at the Guesthouse Inn did not reach anticipated levels.  Further, BAP quickly fell behind in making payments to vendors, utility companies, and Guesthouse.  Indeed, BAP only paid Guesthouse's fees for February 2006, resulting in $29,700.73 in unpaid fees for the period of time that the hotel was operational.  (Docket No. 63 Ex 1.)  On September 28, 2006, the hotel closed and did not reopen under BAP's operation.

On October 6, 2006, Guesthouse terminated the License Agreement on the grounds that BAP had ceased to run the property as a Guesthouse Inn.  On August 8, 2007, Guesthouse filed its Complaint in this court, alleging that BAP breached the License Agreement and breached the Promissory Note.  (Docket No. 1.)  In addition to the $29,700.73 in unpaid fees and the $25,000 from the unpaid Promissory Note, Guesthouse also claims that it is owed $304,581.61 in lost fees under the calculations discussed in the liquidated damages provision.  (Docket No. 65 at 5.) Guesthouse also requests attorney's fees and costs, which, under paragraph 20 of the License Agreement, are recoverable from BAP if Guesthouse is successful in prosecuting or defending an action arising out of the License Agreement.  (*Id.*)   Guesthouse seeks this money from BAP, or from Leslie and Noons as guarantors.  (*Id.*)   Guesthouse also seeks pre-judgment interest.  (*Id.* at 20.)

On December 19, 2007, BAP and Noons filed their counterclaim in this case, seeking rescission of the License and Guaranty agreements and damages, alleging that Guesthouse

engaged in fraud in the inducement, breached the License Agreement, and violated the Tennessee Consumer Protection Act. (Docket No. 25.) After more than a year of motion practice and discovery, Guesthouse filed its Motion for Summary Judgment on November 10, 2008, which seeks summary judgment on Guesthouse's claims and on the defendants' counterclaims. Two days later, BAP and Noons filed their Partial Motion for Summary Judgment, which seeks summary judgment on Guesthouse's claims and summary judgment on the counterclaims, except as to the issue of damages. (Docket No. 68 at 3.) BAP and Noons have also filed three additional motions, that is, two motions to strike and a motion for judicial notice. The court is in the position to rule on all of these motions.

## ANALYSIS

The plaintiff, Guesthouse, claims that the defendant, BAP, has breached the License Agreement and the Promissory Note, and that Guesthouse is entitled to $359,282.34 under the provisions of those agreements, plus pre-judgment interest, attorney's fees and costs. Guesthouse contends that this money is likewise recoverable from defendants Noons and Leslie as guarantors of BAP's obligations under the License Agreement. BAP and Noons counterclaim that they were fraudulently induced into the License Agreement (and the subsequent Guaranty Agreement and Promissory Note), and that Guesthouse breached the License Agreement and violated the Tennessee Consumer Protection Act (TCPA), T.C.A. § 47-18-101 *et seq.* These defendants claim, therefore, that these agreements should be rescinded and this case should be permitted to

8

go to a jury to assess BAP's damages.[3]  For the reasons discussed below, Guesthouse's motion for summary judgment will, in large part, be granted.  That said, because the court considers the liquidated damages provision in paragraph 16(e) of the License Agreement to be an unenforceable penalty, the court will deny Guesthouse's summary judgment motion in part, and grant the defendants' partial motion for summary judgment in part, leaving only the issue of the precise measure of damages owed to Guesthouse.  All other motions will be denied, and the court considers the substantive issues in this case resolved, except for a "simple mathematical calculation" that the court believes the parties can perform on their own, based on the guidance provided by the court herein.

**I.      Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's

---

[3] As BAP and Noons essentially concede in their briefing, it is not proper for Noons, on an individual basis, to assert that he suffered damages as the result of any fraud, breach of contract, or TCPA violation, as he had "no communications with plaintiff concerning the Hotel, did not review the UFOC, and relied entirely on Leslie for information relating to Guesthouse." (Docket No. 69 Ex. 3.)  Rather, BAP and Noons argue, Noons' *liability* is derivative of BAP's liability, so if BAP can show that it is not liable, then Noons would not be liable as a guarantor. (Docket No. 73 at 13.)  Whatever the merits of this position, it is clear that BAP is liable, and, therefore, Noons is liable as well.  For clarity's sake, the court will refer to the counterclaims/defenses in this case as "BAP's," recognizing that Noons' liability is purely derivative.

9

claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which he has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the non-moving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the non-moving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the non-moving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the

parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

## II.     The Cross Motions For Summary Judgment

BAP does not challenge that it is facially in breach of the License Agreement and the Promissory Note or that Leslie and Noons are guarantors of those obligations.[4]  Rather, BAP defends itself by way of three counterclaims, arguing that the License Agreement and the Promissory Note (and related guarantor obligations) should not be enforced and BAP is entitled to damages because 1) BAP was fraudulently induced into signing the License Agreement; 2) Guesthouse breached the License Agreement; and 3) Guesthouse violated the TCPA.  (Docket No. 25.)  As Guesthouse points out in briefing, and BAP fails to challenge, BAP does not have a colorable argument as to how Guesthouse breached the License Agreement, and, therefore, the court will dismiss BAP's breach of contract claim.  (Docket No. 89 at 11.)

Further, in its response to Guesthouse's Motion for Summary Judgment and in its own Partial Motion for Summary Judgment, BAP also asserts that, even if BAP's counterclaims are not viable, Guesthouse is not entitled to the full measure of damages it seeks because the "liquidated damages" provision in paragraph 16(e) of the License Agreement is a "penalty," void for public policy reasons.  (Docket No. 68 at 27-34.)  The court will consider BAP's fraud, TCPA, and penalty arguments in turn.

### A.     The Fraud Counterclaim

_____

[4] As to the guarantors' obligation on the Promissory Note, the Guaranty Agreement states: "[Leslie and Noons] also hereby guarantee the prompt payment to [Guesthouse] of all other obligations, direct or indirect, owed by [BAP] to [Guesthouse] ...".  (Docket No. 1 Ex. 2.)

11

BAP's fraud argument is based on two core allegations. First, is BAP's claim that, during the 2004-2005 negotiations between BAP and Guesthouse, representatives from Guesthouse made a series of forward-looking promises to Leslie about the level of support Guesthouse would provide to BAP once the License Agreement was signed, particularly that Guesthouse would provide marketing, training, and reservation support, along with monthly site visits. (Docket No. 73 at 3.) Second, BAP claims that the UFOC document that Guesthouse used for its engagement with BAP was grossly misleading in terms of the representations it made about the amount of litigation that Guesthouse had faced, about how much money the necessary signage for the hotel would cost, and about "the computer hardware and software requirements relating [to] the operation of the franchise," among other things. (Docket No. 69 at 3.) As discussed below, neither allegation raises a disputed issue of material fact such that Guesthouse would not be entitled to summary judgment, let alone is sufficient for BAP to secure summary judgment in its own right.

As to the alleged misrepresentations made to Leslie during the negotiation process, as the plaintiff points out, although Leslie's misrepresentation allegations are fairly vague, it is possible to see that these alleged misrepresentations were "forward looking," making the proper claim under Tennessee law a claim for promissory fraud. *See Styles v. Blackwood,* 2008 WL 5396804, *7 (Tenn. Ct. App. Dec. 29, 2008). To establish a claim for promissory fraud, the party asserting the claim must show that a material promise of future conduct was made with the intent not to perform, that reliance on the promise was reasonable, and that the party asserting promissory fraud was injured thereby. *Id.* BAP's promissory fraud argument most clearly fails on the

12

element of reasonable reliance.

On reliance, as noted above, there is a very clear "integration" or "merger" clause in the License Agreement, which states: "there are no representations, inducements, promises, agreements, arrangements or undertakings, oral or written, that have been relied upon by the parties other than those set forth herein. ... [BAP] acknowledges that [Guesthouse] and its representatives have made no representations to [BAP], other than or inconsistent with, the matters set forth in the [UFOC] provided to [BAP], and that [BAP] has undertaken this venture solely in reliance upon the matters set forth in the [UFOC] and [BAP's] own independent investigation of the merits of this venture." (Docket No. 70 Ex. 8) (portion after ellipsis in caps in original). Therefore, as the plaintiff points out, "these provisions are quite clear – the defendants did not rely upon any oral representations and, if they had, such reliance would have been unreasonable in light of the express terms of the agreement." (Docket No. 65 at 12.) In short, the plaintiff argues that, in light of the integration clause, BAP could not have reasonably relied on any representations made during negotiations that are not included in the License Agreement or the UFOC.

In response, BAP argues that, under Sixth Circuit precedent, the court is to consider the surrounding circumstances in conjunction with the integration clause to determine whether the party asserting fraud can still establish reasonable reliance. (Docket No. 73 at 3 citing *Shah*, 338 F.3d at 568.) In *Shah*, the Sixth Circuit concluded that "there is no rule that a merger clause makes reliance on oral representations unreasonable *per se* so as to necessarily defeat a fraudulent inducement or promissory fraud claim. ... Promissory fraud under Tennessee law does require

13

reasonable reliance, but nothing suggests the Tennessee judiciary has either adopted or would adopt a *per se* rule that an integration clause makes it *always* unreasonable to rely on prior oral representations." *Shah*, 338 F.3d at 568 (emphasis in original) (internal citation omitted).

*Shah* is not particularly helpful to BAP's attempt to avoid the integration clause. A little less than a year after *Shah*, the Tennessee Court of Appeals held that "proof of fraud in the inducement or promissory fraud is limited to subject matter which does not contradict or vary the terms that are plainly expressed in the written contract." *Burton v. Hardwood Pallets, Inc.*, 2004 WL 572350, *2 (Tenn. Ct. App. March 22, 2004). That is, it is unreasonable to rely on prior oral representations that contradict the language presently before the individual signing the contract. *Id.* Nothing about the circumstances here indicates that the logic of *Burton* is inapplicable. Leslie is a sophisticated party, and, at his deposition, he admitted to having reviewed the integration clause prior to signing the License Agreement. (Docket No. 70 Ex. 5 at 72.) Therefore, BAP cannot defeat Guesthouse's Motion for Summary Judgment (let alone advance its own motion for summary judgment) through arguments based on the alleged oral misrepresentations made by Leslie.[5]

As to the allegations related to misrepresentations in the UFOC, reliance is, once again, the fatal problem. *Jenkins v. Brown*, 2007 WL 4372166, *13 (Tenn. Ct. App. Dec. 14, 2007)

---

[5] It is also notable that BAP makes no attempt to show that any of the Guesthouse representatives lacked the intention to the carry out the promise at issue. (Docket No. 89 at 5.) Under Tennessee law, an allegation of promissory fraud is not sustainable based on the simple showing that a promise of future action was not performed. *Eddings v. Sears Roebuck & Co.*, 2002 WL 1592540, *4 (Tenn. Ct. App. July 19, 2002). Rather, the party alleging promissory fraud must put forth some evidence, beyond mere speculation, to show that the promise was made without the intent to perform. *See Styles v. Blackwood,* 2008 WL 5396804, *7 (Tenn. Ct. App. Dec. 29, 2008). BAP has failed to do this.

14

(reliance is an essential element of common-law fraud). There is no allegation that anyone associated with BAP read the UFOC. Therefore, despite BAP's extensive discussion of the supposed problems with the UFOC, that discussion is not relevant as to whether Guesthouse is entitled to summary judgment.[6] Simply, if no one at BAP read the UFOC, delivered or not, then the court fails to see how the defendants can advance their fraud argument using supposed misrepresentations in that document.

**B.      BAP's TCPA Argument**

As mentioned above, BAP also counterclaims that the plaintiff violated the Tennessee Consumer Protection Act (TCPA), which protects franchisees, such as BAP, from "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." T.C.A. § 47-18-103(2); T.C.A. § 47-18-104(a). Again, BAP's claim is based on (1) the allegedly deceptive statements made by several representatives of Guesthouse during the negotiation process and (2) the circumstances surrounding the delivery of the UFOC and the material therein. For the reasons discussed below, BAP's TCPA claim is not viable.

As to the UFOC, again, there is no allegation that anyone from BAP actually read the UFOC, which renders BAP's lengthy arguments about the supposed flaws in the substance of the UFOC irrelevant for purposes of its TCPA claim, as one requirement of any TCPA claim is that the allegedly deceptive act must have caused the party asserting the TCPA claim some injury. *White v. Early*, 211 S.W. 3d 723, 743 (Tenn. Ct. App. 2006). While, in the proper context, the

---

[6]BAP spends twenty pages of its Memorandum in Support of its Partial Motion for Summary Judgment deconstructing the representations in the UFOC and arguing why those representations are deceptive. (Docket No. 68 at 7-27.)

15

failure of a franchiser to deliver the UFOC to a prospective franchisee might be considered a TCPA violation, here, any argument to that effect is time-barred. As Guesthouse points out, actions commenced under the TCPA must be brought within one year from the claimant's discovery of the unlawful act or practice. (Docket No. 65 at 18, citing T.C.A. § 47-18-110.) Because BAP's TCPA claim is a counterclaim, under Tennessee law, the limitations period extends back from the date that the Complaint in this case was filed, that is, August 8, 2007.[7] T.C.A. § 28-1-114(a).

Therefore, so long as representatives from BAP would have discovered that the UFOC was not delivered prior to August 8, 2006, a TCPA claim based on this delivery failure is time barred. Here, BAP would have been well aware that the UFOC had not been delivered in a timely manner well before the August 8, 2006 date. Indeed, Leslie, who was well acquainted with the concept of the UFOC, signed a document acknowledging receipt of the UFOC on September 14, 2004, so he was certainly aware of any failure to deliver the UFOC well before August 2006. (Docket No. 70 Ex. 7.) Further, the License Agreement explicitly mentioned the presence of a

---

[7]Based on a misreading of T.C.A. § 28-1-114(b), BAP argues that the proper "relation back" date is November 28, 2006, that is, when the plaintiff filed a case against these defendants in Tennessee state court, a case that was eventually non-suited, without the defendants filing a counterclaim. (Docket No. 73 at 10.) T.C.A. § 28-1-114(b) concerns a situation in which the plaintiff has non-suited a case in which the defendant has already filed a counterclaim, which is not the case here. T.C.A. § 28-1-114(b).

BAP also makes a confused argument that, even if its claims are time barred, it is entitled to a "set off." (Docket No. 73 at 11.) BAP does not effectively explain the basis of its position, saying only that a set-off may, in some circumstances, proceed as an independent action and that, "even if the defendant's claims were time barred as Guesthouse claims (which we contend they are not) they may still proceed with the action as a setoff and recover any excess." (*Id.*) Whatever the merits of this point, as discussed herein, BAP is not entitled to any recovery, so there would be nothing to "set off."

UFOC specific to this case, and that agreement was signed by BAP representatives in April 2005. (Docket No. 70 Ex. 8.) So BAP would have certainly discovered the allegedly deceptive act of non-delivery well before August 2006. Therefore, a TCPA claim based upon alleged problems with the UFOC in this case is not a viable path to relief.

As to the allegedly deceptive statements made by Guesthouse personnel to Leslie during franchise negotiations, the court once again agrees that such claims could, in the proper context, be a basis for a TCPA claim. That said, a TCPA claim based on the misrepresentations alleged here is time-barred. As noted above, in his deposition, Leslie did not effectively identify specific misrepresentations; instead his testimony vaguely discussed a supposed pattern of misrepresentations, which the plaintiff aptly describes as "misrepresentations as to post-opening assistance, sales, reservations, marketing and other such matters," along with a more specific allegation that the plaintiff promised its representatives would make monthly site visits. (Docket No. 65 at 19.) The vagueness of the alleged misrepresentations notwithstanding, the failure of the plaintiff's representatives to follow through would have been plainly evident to BAP by August 8, 2006, which was more than six months after the hotel opened. As the plaintiff correctly points out, "with each month that ticked by during the hotel's operation as a Guesthouse, defendants would have been aware of any alleged misrepresentations as to post-opening assistance, sales, reservations, marketing, and other such matters. So too, the failure of specifically designated individuals to make their 'promised' monthly visits to the property would have been quite noticeable." (*Id*.) In sum, based on the allegations here, BAP's TCPA claim is time-barred.[8]

---

[8] In its counterclaim, BAP sought "rescission" of the License Agreement and the Guaranty Agreement on the basis of its fraud and TCPA claims. (Docket No. 25.) When fraud

17

### i. Summary

It is clear from the foregoing discussion that, as a matter of law, BAP breached the License Agreement and the Promissory Note without a valid defense for doing so, and, therefore, BAP is liable on the License Agreement and the Promissory Note, and Noons and Leslie are liable as guarantors of BAP's obligations under the License Agreement and the Promissory Note. The next issue, plainly, is damages.

### D.      Liquidated Damages and Other Damages Issues

Outside of the discussion above, the defendants in this case do not challenge: (1) that they otherwise owe $29,700.73 in unpaid fees due under the License Agreement for the period of time in 2006 that the hotel was operational; (2) that they otherwise owe $25,000 under the Promissory Note; or (3) that Leslie and Noons are guarantors of those obligations. In both its response to Guesthouse's summary judgment motion and in its own Motion for Partial Summary Judgment, BAP does assert, however, that the liquidated damages provision in paragraph 16(e) of the License Agreement (which, based on the plaintiff's calculation, calls for the defendants to pay an additional $304,581.61) amounts to an unenforceable "penalty." (Docket No. 68 at 27-34.)

The premise of BAP's argument is that paragraph 16(e) allows Guesthouse to "round up" to the next whole year when calculating the Reservation Fee damages owed. That is, while BAP abandoned the hotel with about six years and four months left on the License Agreement,

---

or deceptive conduct is alleged, rescission is only appropriate when such conduct is shown by clear and convincing evidence. *See Styles,* 2008 WL 5396804, *6. As discussed above, BAP has not raised a fact issue as to whether the License Agreement should be not enforced due to fraud. Therefore, rescission is plainly inappropriate.

18

Guesthouse, under the liquidated damages provision, calculated its Reservation Fee damages as if there were seven years remaining on the License Agreement. (Docket No. 68 at 29.) BAP argues that the provision "rewards" Guesthouse for its licensee's failure, as Guesthouse recovers more money than it would have, had the License Agreement been fully performed. (*Id.*)

Under Tennessee law, the term "liquidated damages" "refers to an amount determined by the parties to be just compensation for damages," should a contract breach occur. *Vanderbilt Univ. v. DiNardo*, 174 F.3d 751, 755 (6th Cir. 1999). The fundamental purpose of a liquidated damages provision is to provide a means of compensation in the event of a breach where damages would be indeterminable or otherwise difficult to prove. *Guiliano v. Cleo, Inc.*, 995 S.W. 2d 88, 98 (Tenn. 1999).

Tennessee courts "have long recognized the freedom of parties to agree upon terms that may not appear desirable to outsiders and the duty of the courts to refrain from interfering with the parties' agreement unless to enforce it would violate established public policy." *Anesthesia Med. Group v. Chandler*, 2007 WL 412323, *9 (Tenn. Ct. App. Feb. 6, 2007). The courts will uphold a liquidated damages provision, if "the liquidated damages specified were a reasonable prediction of what a breach would cost the injured party in light of circumstances at the time the contract was formed." *U.S. v. Ponnapula*, 246 F.3d 576, 584 (6th Cir. 2001). Therefore, "the amount of actual damages at the time of breach is of little or no relevance to whether the clause is an impermissible penalty." *Id.* Courts will not, however, enforce a liquidated damages provision "if the stipulated amount constitutes a penalty." *Vanderbilt Univ.*, 174 F.3d at 755. A penalty is "designed to coerce performance by punishing default." *Id.* Any doubt as to the character of a contract provision "will be resolved in favor of finding it a penalty." *Id.*

19

While the question is close, the court believes that, under the law discussed above, this liquidated damages provision does operate as a penalty, because it did not provide "a reasonable prediction of what a breach would cost the injured party in light of the circumstances at the time the contract was formed." *Ponnapula*, 246 F.3d at 584. By way of review, the liquidated damages provision calls for Guesthouse to recover the Operating Fees and Reservation Fees for the entire period remaining on the License Agreement from the date of termination. Operating Fees are calculated on a daily basis using a relatively simple formula. (Docket No. 70 Ex. 8 at A-1.) Reservation fees, on the other hand, are calculated by "multiplying the number of years remaining in the term of this Agreement (rounding any partial years up to the next whole number) by the sum of the monthly Reservation Fees ... due ... during the one year period immediately preceding the notice of termination (annualized to the extent this Agreement was not in effect for the entirety of said one year period.")  (*Id.* at 17-18.)

Therefore, because of the Reservation Fee provision, unless the contract was terminated on the precise anniversary date of the License Agreement, Guesthouse would be entitled to more Reservation Fee money than it would have otherwise been entitled to if the contract had been performed. Importantly, this would have been readily apparent to Guesthouse at the time the contract was formed. Also, there is no provision for any of the costs that Guesthouse saved as a result of the breach to be deducted, further indicating that this clause penalizes breach, rather than being designed to be a reasonable estimate of damage. Further, by requiring payment of fees from February 2006 to September 2006 (the time that the hotel was open) in addition to sums calculated under the liquidated damages clause, the liquidated damages clause here would allow Guesthouse a double recovery of its reservation fees for that period. The court has "doubt" about

20

whether this liquidated damages clause operates as a penalty and, therefore, under the precedent of this Circuit, the court concludes that the liquidated damages clause here operates as a penalty.

That said, the court strongly believes that, with the guidance of this opinion, a trial on the damages issue should not be necessary. As noted above, the defendants are plainly responsible for the $25,000 on the Promissory Note, and the $29,700.73 in fees connected to the time period that the hotel was open. Further, BAP's argument here was that "rounding up" was the problem, not that Guesthouse is not otherwise entitled to the Operating and Reservation fees it would have received, had BAP not defaulted.

Calculating these Operating and Reservation fee amounts should be a matter of simple math. As to the Operating Fees, the calculation is simple, that is, for each day remaining on the License Agreement, the fee can be easily calculated by multiplying the pre-set fee for that day by the number of rooms, and adding up the results. (Docket No. 70 Ex. 8 at A-1.) As to the Reservation Fees, the calculation should consist of the "annualized" (or pro-rata) reservation fee for the first year multiplied by the 6+ years that remained on the License Agreement at the time of termination. (Docket No. 78 at 34.) As Guesthouse has argued in support of its damage calculation, arriving at the precise amount of damages in this case is a "simple mathematical calculation" and, therefore, the court expects the parties can, without significant difficulty, resolve the precise amount owed based on this guidance.[9] (Docket No. 89 at 15.)

_____

[9] Even if the court concluded that the liquidated damages provision here was not a penalty, the court still would have had difficulty granting summary judgment for the plaintiff on the precise amount of damages. In the affidavit of Guesthouse CFO Bob Marlowe, which is apparently the plaintiff's sole support for its damage calculation, the court can locate little support for Marlowe's precise conclusion that $304,581.61 in termination fees are owed. Marlowe only superficially stated that he had used the method described in paragraph 16(e) of

21

### i. Pre-judgment interest

As noted above, the plaintiff has asked for pre-judgment interest on the "past due" amount of $359,282.34 from the date of termination (October 6, 2006) to the date of judgment, at the "formula rate" of 12.25 percent. (Docket No. 63.) While a trial court may award pre-judgment interest in circumstances such as this case, the decision whether or not to award that interest is left to the "sound discretion" of the trial court. *Myint v. Allstate Ins. Co.*, 970 S.W. 2d 920, 927 (Tenn. 1998). The baseline principle for the trial court to use is whether it is "fair," under principles of equity, to award pre-judgment interest. *Id.* "If the existence or amount of an obligation is certain, this fact will help support an award of prejudgment interest as a matter of equity." *Id.* at 928.

The court declines to award pre-judgment interest here. Not only is the precise amount of the obligation uncertain at this time, but, from a fairness perspective, the defendants have gained nothing from this ill-considered foray as a Guesthouse franchisee, as they will have to pay seven years of reservation and operating fees for a hotel that they ran (unprofitably) for just eight months. In short, while the court recognizes the merit of the plaintiff's argument, an award of pre-judgment interest here strikes the court as "piling on" the defendants. The defendants are responsible for honoring a deal that, in retrospect, seems ill-considered, but it is not the court's job to compound that hardship by using its discretion to award pre-judgment interest. Therefore,

---

the License Agreement, and, using that method, concluded that $285,722.02 in Operating Fees and $18,859.59 in Reservations Fees were owed under paragraph 16(e). (Docket No. 63 Ex. 1.) While the court does not doubt Marlowe's mathematical skills or integrity, for purposes of a motion for summary judgment involving a precise damage calculation, Marlowe should have "showed his work."

the plaintiff's request for pre-judgment interest will be denied.

### ii. Attorney's fees and costs

As the plaintiff correctly points out, paragraph twenty of the License Agreement and paragraph seven of the Guaranty Agreement provide that the plaintiff, as it has successfully prosecuted and defended this action, is entitled to attorney's fees and costs related thereto from the defendants in this case. (Docket No. 65 at 20.) The defendants have offered no basis for the court not to enforce these provisions. The court does not make a specific award at this time as the plaintiff has said it will show "reasonable fees and expenses ... by affidavit at the conclusion of these proceedings." (*Id.*) This decision only affects attorney's fees and costs incurred to date. The court expects a resolution of the precise damages issue, in light of the guidance provided above, would add only nominally to those costs, and, therefore, each party will bear their own costs for time spent resolving that issue. Should it later become clear that one side has unduly delayed the process, the court will certainly reconsider.

## III. Other Motions

As noted above, there are three additional motions pending before the court, none of which affect the outcome addressed above. First, prior to summary judgment briefing, BAP and Noons filed a Motion for Judicial Notice, which requested that the court take judicial notice of the adjudicative facts announced in an October 23, 2008 opinion of the Sumner County, Tennessee Chancery Court, in a case involving Guesthouse. (Docket No. 59 Ex. 1.) BAP and Noons ask the court to take judicial notice of these facts because "the adjudicative facts, which are undisputed, are relevant to this litigation as it relates to the disclosures in [Guesthouse's UFOC], which the defendants contend, and will prove is materially defective." (Docket No. 62 at 2.) Again, for the

23

reasons discussed above, any substantive deficiencies in the UFOC are not of consequence here as there is no dispute that the defendants did not review the UFOC during the relevant time period. Therefore, this motion will be denied as moot, because, even assuming the court took judicial notice of these facts, the outcome of this dispute would not change.

Second, BAP and Noons moved to strike "certain references" in the plaintiff's response to their Motion for Partial Summary Judgment. (Docket No. 81.) Specifically, these defendants request that certain references to Noons and Leslie's past failed business ventures, Leslie's personal bankruptcy, and references to a charge of bank fraud against Noons be stricken. (Docket No. 82 at 1-2.) Under Fed. R. Civ. P. 12(f) these defendants ask the court to strike these references as "scandalous, impertinent, and irrelevant," and they ask the court to order that the plaintiff re-plead its response without the offending material. (*Id.* at 6.) This motion is without merit. As the plaintiff points out, Leslie referenced Noons' bank fraud charge in a September 2006 e-mail to GuestHouse, in which Leslie explained that the hotel had been struggling because it could not get loans because of the old bank fraud charge against Noons. (Docket No. 90 at 4.) Further, the previous bankruptcies and failed past business ventures are relevant to the cause of the hotel's failure. (*Id.* at 5.) This Motion to Strike will be denied, and, as to the plaintiff's request for costs for responding to this motion, the court has recognized above that, under the License Agreement, the plaintiff is generally entitled to the costs and fees associated with prosecuting and defending this action.

Third, BAP and Noons also moved to strike the declarations of Mr. Bulso and Mr. Marcou, which the plaintiff filed in support of its response to the Motion for Partial Summary Judgment, and all references to those declarations, or, in the alternative, to disqualify Bulso as

24

plaintiff's counsel and to re-open discovery so that Bulso and Marcou can be deposed. (Docket No. 84.) This motion likewise will be denied.

BAP and Noons contend that they were blind sided by the declarations of Marcou and Bulso, which were filed after discovery closed. (Docket No. 85 at 2.) As discussed above, Marcou's declaration states that he is reasonably sure that he provided a copy of the Guesthouse UFOC to Leslie. (Docket No. 75 Ex. 1.) Bulso's declaration states that he was involved in drafting one section of the Guesthouse UFOC. (Docket No. 75 Ex. 2.) As to Marcou, the court fails to see how these defendants were blind sided by his declaration; in their own counterclaim, BAP and Noons claimed that Marcou was one of the individuals who made misrepresentations to Leslie. (Docket No. 25.) Certainly, BAP and Noons could have taken Marcou's deposition to discover more about his role in this case. The court will not strike Marcou's declaration or re-open discovery simply because the defendants were surprised by the substance of a declaration of a witness who they must have suspected had pertinent information. As to Bulso, his declaration has no bearing on the court's decision, given the facts of this case. As the plaintiff points out, "the record [] demonstrates that neither BAP nor Noons even read Guesthouse's UFOC ...". (Docket No. 91 at 2.) As no one from the defendants' side reviewed Bulso's language during the relevant time period, they could not have relied on it or suffered damage from it, and, therefore, BAP's claims based on the UFOC fail well before the court needs to consider whether Bulso is a necessary witness who should be disqualified or whether his affidavit should be stricken. Therefore, this motion to strike will be denied as well.[10]

_____

[10] The court acknowledges that, based on the defendants' argument that they could not fashion a reply in support of their partial Motion for Summary Judgment without knowing the

Case 3:07-cv-00814    Document 97    Filed 02/05/09    Page 25 of 26 PageID #: 2177

**CONCLUSION**

For the reasons discussed above, the plaintiff's Motion for Summary Judgment will, in large part, be granted, the defendants' Partial Motion For Summary Judgment will be granted in part and denied in part, and all other pending motions will be denied.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

---

results of their motions to strike, the court granted defendants BAP and Noons an indefinite extension to file their reply in support of their Motion for Partial Summary Judgment. (Docket No. 88.) The court further acknowledges that this Memorandum and the corresponding Order will be issued without these defendants having had an opportunity to submit that reply. For the court, this issue is of little moment because the defendants' Motion for Partial Summary Judgment focused, almost exclusively, on two issues, that is, (1) the supposed substantive defects in the UFOC and (2) the allegedly punitive nature of the liquidated damages clause. (Docket No. 68.) As discussed above, any substantive problems with the UFOC are of no consequence because it is not alleged that any of the defendants actually read the UFOC at issue during the relevant time period. Also, whether the liquidated damages clause is punitive is an issue that both sides briefed in the plaintiff's Motion for Summary Judgment, and then, again, in the initial briefing of the defendants' Partial Motion for Summary Judgment. This resulted in all sides having more than ample opportunity to address whether the liquidated damages clause here operated as a "penalty," and, indeed, the court's conclusion on that issue is favorable to these defendants. More briefing will not change Landis' and Noons' deposition testimony that they never read the Guesthouse UFOC and more briefing will not change the timing of the events in this case as far as the statute of limitations is concerned. In short, denying the motions to strike and permitting these defendants to file a reply in support of their Partial Motion for Summary Judgment would only delay the inevitable and result in more costs for BAP and Noons.

26